# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# THOMASVILLE DIVISION

UNITED STATES OF AMERICA, :
 :
   v. :  Criminal Action No. 6:05-cr-17 (HL)
 :
W. DEXTER HARRISON, :
MARTIN L. HARRELL, and :
CHARLES L. HARRELL, :
 :
   Defendants. :
_____

## ORDER

Before the Court is the question of which communications between Defendant Martin Harrell and his wife Julie Harrell will be admissible at Martin Harrell's upcoming trial and which are inadmissible by virtue of the marital communications privilege. Because this matter defies a simple answer, the Court's reasoning and detailed ruling are set forth below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Government seeks to introduce various conversations, recordings and observations of Julie Harrell at Martin Harrell's upcoming trial. In its Response (Doc. # 254) to Martin Harrell's Motions in Limine Concerning Marital Privilege (Doc. #'s 155, 166), the Government presents graphic and extensive descriptions of physical, mental and sexual abuse allegedly perpetrated by Martin Harrell on Julie Harrell. In doing so, the Government offers the Court two alternative theories upon which it could rule the communications at issue are admissible: wholesale or piecemeal. Under the first approach, the Government argues the Court can find

1

the Harrells' marriage was no longer valid as of a certain date, and therefore all of Julie Harrell's subsequent conversations, recordings and observations are admissible.  Under the second approach, the Government asks the Court to examine each portion of Julie Harrell's anticipated testimony and determine its admissibility individually.

The majority of the incidents described in the Government's Response are detailed in diaries and tape recordings made by Julie Harrell between May 3, 1999 and January 7, 2002, but additional information regarding the state of their marriage is expected to be presented at trial through the testimony of two inmates housed with Martin Harrell in the Dooley County Jail, several neighbors of the Harrells and representatives of the Grady County EMC.  (Doc. # 254 at 22-25.)  Again, the Government presents this material for one of two reasons: to prove that the Harrells' marriage is not worthy of protection by the Court or, alternatively, to establish that, even if the Court does not declare the entire marriage invalid, the marital communications in question are admissible because of various exceptions to the marital communications privilege.  In furtherance of these twin purposes, the Government presented testimony by Julie Harrell at a pretrial conference on April 12, 2006.

## II.   ANALYSIS

### A.   Marital Privilege

Two types of marital privilege exist.  The testimonial privilege, which vests in the witness-spouse, grants that witness the privilege to refuse to testify adversely.  Trammel v. United States, 445 U.S. 40, 53 (1980) ("[T]he witness may be neither compelled to testify nor foreclosed from testifying.").  This privilege is not at issue in this case.  The marital

communications privilege protects confidential communications between a husband and wife, and "marital communications are presumptively confidential." Blau v. United States, 340 U.S. 332, 333 (1951).  The martial communications privilege, when available, can be asserted by a defendant to prevent his spouse from testifying concerning the contents of the communication and to exclude related evidence.  United States v. Singleton, 260 F.3d 1295, 1298 n.2 (11th Cir. 2001).  Finally, it is well established that courts presumptively disfavor all privileges, including marital privileges, because they impede the search for truth.  Id. at 1299.

**B.**     **Did a Valid Marriage Exist? – i.e., the Wholesale Approach**

The United States Court of Appeals for the Eleventh Circuit has held the marital communications privilege is not available when a married couple was permanently separated at the time of communication.  Id. at 1301.  In determining whether a couple was permanently separated, a district court should focus particularly on three objective factors: "(1) Was the couple cohabitating?; (2) if they were not cohabitating, how long had they been living apart?; and (3) had either spouse filed for divorce?"  Id.  A court may also consider "other objective evidence of the parties' intent or lack of intent to reconcile" or "testimony by the spouses themselves regarding their subjective intent."  Id.  Finally, where the Government has objected to the application of the privilege on the basis that the parties were permanently separated, the defendant/spouse invoking the privilege bears the burden of proof to show by a preponderance of the evidence that he and his wife were not permanently separated at the time of the subject communication.  Id.

Here, the Government concedes that at all relevant times, the Harrells were legally

married, cohabitating and neither had filed divorce papers.  (Doc. # 254 at 42.)  However, the Government urges the Court to look beyond these objective factors to the subjective factors of the parties' intent and to examine the public policy reasons for protecting the marital privilege. First, the Government argues that Martin Harrell had no subjective intent to remain married, as evidenced by the frequency with which he abandoned the marital home, his challenges to Julie Harrell to get a divorce, his telling Julie Harrell they were no longer married, and his providing Julie Harrell with a $700 check to hire a divorce attorney, along with a statement that he would give her a divorce.  (Id. at 41-42.)  Second, the Government contends Martin Harrell's physical, mental and sexual abuse of Julie Harrell indicated he had no intent to reconcile.  (Id. at 42-43.) Third, the Government presents five cases in which it asserts courts have found exceptions to the marital communications privilege based on policy concerns when a spouse commits both abuse and crime and then tries to hide behind the privilege.  (Id. at 44-46.)

The Singleton case can be distinguished from the case at hand.  In Singleton, the parties had been living apart for more than a year and a petition for divorce had been filed before the conversation in question took place.  Here, while Martin Harrell and Julie Harrell had not cohabitated continuously, the longest period they had lived apart, per the Government's assertion, was two weeks.  Also, although the Harrells had discussed separation and divorce, no divorce papers were ever filed.  As the objective factors from Singleton all weigh in favor of the Court's finding a valid marriage existed, for the Court to find the Harrells' marriage was moribund, it would necessarily be doing so based solely on the alleged abuse and for public policy reasons.

4

Of the five cases cited by the Government, only two actually support its position; the other three can be distinguished.  In the first supportive case, the Court of Appeals of New York found that the marital communications privilege should not protect statements made while a husband was choking his wife and threatening her, and allowed testimony regarding a different crime he disclosed to her during the assault.  People v. Mills, 804 N.E.2d 392 (N.Y. 2003).  Similarly, in the second case, the Supreme Court of Bronx County, New York found a confession that a husband had committed arson, made to his wife in conjunction with his threat to repeat his actions against his wife's family, was not protected by the privilege.  People v. D'Amato, 105 Misc. 2d 1048, 430 N.Y.S. 2d 521 (N.Y. Sup. Ct. 1980).

The Government's public policy argument has a certain appeal—that spouses engaged in criminal activities should not be able to use the marital communications privilege to block their innocent spouses from testifying to these crimes.  On one level, this analysis calls for the Court to balance the right of an individual to engage in unlawful activity against the right of the public to be protected from such activity.  Under this comparison, the Court's decision seems like a simple one to make.  However, on a deeper level, announcing such a holding could chill the very institution of marriage and could have grave, unintended consequences.  As other courts have recognized, and this Court finds persuasive, the judiciary should be extremely hesitant to play any role in determining which marriages are worth protecting. See Appeal of Malfitano, 633 F.2d 276, 278-79 (3d Cir. 1980). The Court endorses the primacy of public

protection above individual privacy reflected by the joint participation exception.[1]  The Court

recognizes the wisdom in the Eleventh Circuit's differentiation between permanent separations

and valid marriages in Singleton.  However, if any court is going to further weaken the marital

communications privilege to include a "single participation exception," that court should be the

Eleventh Circuit.

    The next two cases stand for the distinguishable proposition that a spouse should not be

allowed to hide behind the marital communications privilege when he commits abuse in an

attempt, successful or not, to enlist his partner in ongoing criminal behavior.  The New York

State Supreme Court, Appellate Division, Fourth Department held the marital communications

privilege does not apply to threats made in pursuit of a criminal enterprise, as opposed to its

protection of statements made out of affection, confidence or loyalty in the marital relationship.

 People v. Naylor, 502 N.Y.S.2d 856 (N.Y. App. Div. 1986) (holding a defendant's wife may

testify about conversations he had with her in which he unsuccessfully attempted to enlist her

---

[1] A number of circuit courts have also developed a "joint participants" exception, under which confidential marital communications are not protected if they pertain to joint criminal activity engaged in by both spouses.  See United States v. Van Drunen, 501 F.2d 1393 (7th Cir. 1974);  United States v. Mendoza, 574 F.2d 1373 (5th Cir. 1978); United States v. Ammar, 714 F.2d 238 (3d Cir. 1983); United States v. Broome, 732 F.2d 363 (4th Cir. 1984); United States v. Sims, 755 F.2d 1239 (6th Cir. 1985); United States v. Marashi, 913 F.2d 724 (9th Cir. 1990).  In these decisions, the courts "reasoned that the public's interest in discovering the truth about criminal activity outweighed the public's interest in protecting the privacy of marriage where the conversations in question related directly to criminal activity."  Sims, 755 F.2d at 1241.  However, none of these cases address a situation where a single spouse discloses a criminal activity, in which only he is involved individually, to his innocent spouse. This is a particularly relevant distinction here, since Mendoza, decided by the Fifth Circuit before September 30, 1981, is binding precedent in the Eleventh Circuit.  Nonetheless, there the court held: "conversations between husband and wife about crimes in which they are jointly participating when the conversations occur are not marital communications for the purpose of the marital privilege." Mendoza, 574 F.2d at 1381 (emphasis added).

6

support in a criminal scheme).  Similarly, the Tennessee Court of Criminal Appeals held it was not a violation of the marital communications privilege to allow a wife to testify to her husband's statements coercing her active assistance in a kidnapping and murder through threats. State v. Hauck, 1992 WL 75832 at *3 (Tenn. Crim. App. 1992) ("The public policy rationale behind Tennessee's spousal privilege rule should not, in our opinion, protect the actions or statements of one who involves his or her spouse in an ongoing criminal enterprise by force or threat of harm.").

Here, by contrast, Martin Harrell never attempted to enlist Julie Harrell's assistance in any criminal activity.  Indeed, Julie Harrell's proffered testimony reflects Martin Harrell primarily sought to keep her in the dark about any criminal activity in which he may have been engaged, and when he threatened her, it was not to gain her assistance.  Therefore, unlike the situations in Naylor and Hauck, Martin Harrell is not using the marital communications rule to protect himself, having involved Julie Harrell in an ongoing criminal enterprise.  Julie Harrell has never been charged with any of the crimes listed in the indictment in this case, nor has it been alleged that she is any more than an innocent victim of spousal abuse.

The final case stands for the more common proposition that a battered spouse, or the parent of a battered child, need not be silenced by the marital communications privilege in regards to testimony about *that abuse*.  See United States v. White, 974 F.2d 1135, 1138 (9th Cir. 1992) ("[T]he marital communications privilege should not apply to statements relating to a crime where a spouse or the spouse's children are the victims.").  In such a situation, courts have found a defendant spouse may not commit abuse and then hide behind the marital privilege

to shield himself from criminal prosecution *based on that abuse*.   These cases do not contemplate the disclosure of an abusive spouse's confidential statements relating to a *separate* criminal activity.

The Government's basic argument is that "any statement made in conjunction with a threat is admissible."   (Doc. # 254 at 46.)   While the Court could theoretically find that no public policy rationale would be served by protecting Martin Harrell's statements with the marital communications privilege due to the allegation that he had abused his wife for fifteen years, by doing so, it would be announcing a holding that would stretch the <u>Singleton</u> test to its limits, if not beyond.   For better or worse, it appears that abusive husbands who happen to be engaged in individual criminal activity still enjoy the marital communications privilege as it relates to those other activities in the vast majority of courts in the nation.   <u>See, e.g.</u>, <u>State v. Christian</u>, 841 A.2d 1158, 1176-77 (Conn. 2004) ("Although the defendant's marriage may have been acrimonious at the time that he made the communications to his wife, the marital communications privilege nonetheless was valid. . . .   Accordingly, we conclude that the defendant's communications to his wife, made while the couple was living together as husband and wife, were subject to the marital communications privilege insofar as those communications were confidential.").   Based on its analysis of <u>Singleton</u>, and for the aforementioned reasons, the Court finds a valid marriage existed at all relevant times.   Martin Harrell is therefore entitled to assert the marital communications privilege.

**C.**   **Does Each Component of Julie Harrell's Anticipated Testimony Satisfy the Marital Communications Privilege? – i.e., the Piecemeal Approach**

Four prerequisites must be met for the marital communications privilege to apply and preclude a statement's admission: (1) it must be a communication, as observations are not privileged; (2) the communication must have been made in confidence, as statements made in front of third parties or intended to be passed on to third parties are not privileged; (3) there must have been a valid marriage at the time of the communication; and (4) the privilege must not have been waived. Pereira v. United States, 347 U.S. 1 (1954). In its Response, the Government proffers a detailed analysis of Julie Harrell's anticipated testimony in light of these four prerequisites. (Doc. # 254 at 46-53.) Mindful of its conclusion regarding the validity of the Harrells' marriage, the Court will now conduct its own evaluation of the admissibility of Julie Harrell's proffered testimony against the first, second and fourth prerequisites.[2] Should counsel for the Government or either Defendant have additional objections to the rulings in this Order, or should additional controverted testimony arise, the Court shall address such objections at trial prior to the testimony of any such witness.[3]

### 1. Cattle Arriving at the Harrell Farm

The Government states Julie Harrell will testify that she observed cattle arriving at the Harrell farm. (Id. at 46.) Observations are not protected under the marital

---

[2] Although the Court issues this Order regarding the admissibility of the anticipated testimony of Julie Harrell in light of the marital communications privilege, it recognizes that additional objections may be raised at a later date in regards to this testimony based on other privileges and evidentiary rules. Such objections shall be dealt with if and when they arise.

[3] The Court notes additional outstanding motions exist in this case which it has not ruled on, including those dealing with potential 404(b) evidence. These motions will be ruled upon in a separate order before trial.

communications privilege, and therefore such testimony is not inadmissible due to the privilege.

**2.      Martin Harrell Telling Julie Harrell About His Business Agreement With Bill Chandler**

The Government next states Martin Harrell told Julie Harrell that he and Bill Chandler had entered into an agreement to "grow off" the aforementioned cattle.  (Id.)  The Government states this information is not entitled to the marital communications privilege because it "was not intended to be private as it was information already known by Chandler." (Id.)  However, the key inquiry under the marital communications privilege is not whether other people may have known certain information, but whether the communication in question was intended to be private—and that privacy can be destroyed when statements are made in the presence of third parties.  There has been no allegation here that Bill Chandler was present when Martin Harrell allegedly told Julie Harrell about the two men's agreement, nor that Martin Harrell told Julie Harrell this information with the intent that she pass it on to others.  Therefore, the communication will be presumed private and inadmissible.[4]

**3.      Julie Harrell's Knowledge Regarding Bill Chandler's Being New to the Area**

The Government contends Julie Harrell will testify she learned from other members of the community that Bill Chandler was new in town and that several local farmers

---

[4] The Court recognizes the Government may be able to provide other, valid reasons to find this testimony admissible or introduce other testimony so that the gist of the comments is admitted into evidence without Julie Harrell's testifying to the communication itself.  The Court expresses no opinion on such or similar potential future rulings.

were engaged in "growing off" cattle on his behalf.  (Id. at 46-47.)  This information is not related to the marital relationship and therefore not subject to the marital communications privilege.

### 4.    Julie Harrell's Observation That Tending to a Large Number of Cattle Was Driving Martin Harrell Crazy

The Government asserts Julie Harrell observed that tending to such a large number of cattle was driving Martin Harrell crazy.  (Id. at 47.)  Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to the privilege.[5]

### 5.    The Death of Six Cattle

The Government states that Julie Harrell will testify that she observed six cattle die after they got in the cow pen.  (Id.)  Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to the privilege.

### 6.    Martin Harrell's Call to "The Guy" Regarding Cattle Death

The Government contends Julie Harrell will testify that she observed Martin Harrell calling "the guy" and telling him that six cattle had died during hauling.  (Id.)  Because Martin Harrell made this statement to a third party, albeit over the telephone, in Julie Harrell's

---

[5] The Court notes, however, that the Government has provided no details on what exactly Julie Harrell observed that revealed to her Martin Harrell's taking care of the large number of cattle was "driving him crazy."  Therefore, while observations are not subject to the marital communications privilege, the Court is unsure of exactly what Julie Harrell will testify to in regards to this point, or whether other valid objections could potentially be made.

presence, this communication was not made in confidence.  Therefore, Martin Harrell cannot assert the marital communications privilege to stop Julie Harrell from testifying to this communication.

### 7.    Martin Harrell's Coming Home Laughing

The Government asserts Julie Harrell will testify that she observed Martin Harrell come home laughing.  (Id.)  Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to the privilege.

### 8.    Two Cattle Being Killed By a Vehicle

The Government contends Julie Harrell will testify that "a guy hit two of Marty's calves with a vehicle."  (Id.)  The Government states Julie Harrell does not remember personally seeing the accident, but believes she was informed of it later by 911 dispatchers.  (Id.)  Such testimony does not implicate the marital communications privilege, and will not be inadmissible on that ground.

### 9.    Martin Harrell's December 31, 1999 Call to Julie Harrell

The Government asserts Julie Harrell will testify that Martin Harrell called her on December 31, 1999, and told her he was unable to join her for lunch because the cows were out.  (Id.)  While the Government admits this was a communication, it asserts the communication is not entitled to protection because it was made during the period of time Martin Harrell was abusing Julie Harrell and threatening to leave her.  For the reasons stated earlier in this Order, Martin Harrell's abuse and/or threat to leave did not render the Harrells' marriage invalid.  Therefore, this communication should be entitled to protection and is

inadmissible

**10.    Julie Harrell's Observation That Martin Harrell Was Obsessed With Bill Chandler**

The Government asserts Julie Harrell "observed that [Martin Harrell] became obsessed with Bill Chandler." (Id. at 48.)  Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to the privilege.[6]

**11.    Martin Harrell's Nightly Phone Calls to His Father**

The Government contends Julie Harrell will testify that she heard Martin Harrell talking every night on the phone to his father about ways that they could get Bill Chandler.  (Id.)  Because Martin Harrell made this statement to a third party, albeit over the telephone, in Julie Harrell's presence, this communication was not made in confidence.  Therefore, Martin Harrell cannot assert the marital communications privilege to stop Julie Harrell from testifying to this communication.

**12.    Julie Harrell's Observation That Martin Harrell Took Her Car**

The Government asserts Julie Harrell observed that Martin Harrell borrowed her car some day in late July or early August.  (Id.)  Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to

---

[6] Again, the Court notes that the Government has provided no details on what exactly Julie Harrell observed that revealed to her that Martin Harrell was obsessed with Bill Chandler.  Therefore, while observations are not subject to the marital communications privilege, the Court is unsure of exactly what Julie Harrell will testify to in regards to this point, or whether other valid objections could be made.

the privilege.

### 13.    Martin Harrell's Telling Julie Harrell His Dad Was in the Car with Him

The Government asserts that Julie Harrell will testify to a phone call she placed to Martin Harrell, in which he told her his father was present in the car with him and he could not talk then but would be home later.  (Id.)  The Government opines that this communication "was not intended to be confidential because [Martin's] father was present with him at the time that it was made."  (Id.)  However, unlike the situation in Pereira, where the spouses were both in the car with a third party, thus destroying the confidentiality of the communication, here Julie Harrell was not present in the car with Martin Harrell.  Therefore, there is no proof that Don Harrell was actually in the car, or that the privilege was destroyed.  Accordingly, this communication is entitled to protection based on the marital communications privilege.

### 14.    Martin Harrell's Telling Julie Harrell That He Had Hired a Hit-Man With His Father

The Government contends Martin Harrell told Julie Harrell that he and his father had gone to Moultrie and the two of them had hired a hit-man.  (Id.)  While admitting this was a communication, the Government asserts it was not intended to be confidential because "it was already known by [Martin's] father," and it came days after Martin Harrell had engaged in a violent outburst and threatened to leave the marriage.  (Id.)  The allegation that the communication was not intended to be confidential because this information was allegedly already known by a third party is a mischaracterization of the "in confidence" rule.  There has

14

been no allegation that Don Harrell was present when Martin Harrell made this statement to Julie Harrell, nor that the statement was clearly intended to be passed on to Don Harrell.  Were Don Harrell to testify that either of these scenarios had taken place, then Martin Harrell may have been said to have waived his privilege.  But, to the Court's knowledge, Don Harrell has never so testified.  Therefore, to allow the privilege to be defeated by such circular reasoning would be to countenance an end run that would swallow the entire privilege.  In addition, as discussed at length earlier in this Order, outbursts or threats to leave the marriage did not render it invalid.  This statement is entitled to the protection of the privilege.[7]

### 15.   Julie Harrell's Observation That Martin Harrell's Gun Was Missing

The Government asserts Julie Harrell observed that Martin Harrell's gun was missing.  (Id.)  Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to the privilege.

### 16.   Martin Harrell's Comment Regarding His Missing Gun

The Government asserts that Martin Harrell, in response to a question from Julie Harrell regarding the location of his missing gun, told her that his father had borrowed it.  (Id.)  Again, the Government argues this was not a confidential communication because Don Harrell already had knowledge of the contents of the communication.  The Court will not sanction such an end run around the marital communications privilege.

---

[7] Currently pending before the Court is Defendant Ladon Harrell's Motion in Limine objecting to the admissibility of this alleged conversation between Martin Harrell and Julie Harrell as hearsay not included within any exception to the hearsay rule.  (Doc. # 263.)  Because the Court has ruled the conversation in question is inadmissible in the trial due to the marital communications privilege, it need not consider Ladon Harrell's argument regarding hearsay.  Therefore, the Motion is denied as moot.

**17.    Martin Harrell's Throwing the Gun on the Fridge and Threatening Julie Harrell**

The Government contends Julie Harrell may testify to an exchange where Martin Harrell brought his gun home, threw it on the fridge, and when she retrieved it and tried to place it in a safer place, he threatened her with it.  (Id. at 49.)   The Government argues Martin Harrell's threats remove this exchange from privilege.  Although some portions of this exchange are admissible as observations, the threat alone does not free Julie Harrell from the privilege and allow her to testify as to Martin Harrell's statements.  Accordingly, Julie Harrell's observations are admissible, but Martin Harrell's comments are inadmissible.

**18.    Julie Harrell's Observing Martin Harrell Working on Paperwork**

The  Government  asserts  Julie  Harrell  observed  Martin  Harrell  working  on paperwork about Bill Chandler and a lawsuit.  (Id.)  Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to the privilege.

**19.    Martin Harrell's Confessing to Julie Harrell That He Killed Bobby Powell**

The Government states Julie will testify Martin admitted he had killed "that man," and implied that she should keep quiet or he would kill her too.  (Id.)  Once again, the Court does not believe such a threat is sufficient to remove the privilege.  This communication is inadmissible due to the marital communications privilege.

**20.    The First Taped Conversation**

The Government wishes to submit a taped conversation, the first of a number made by Julie Harrell, in which Martin Harrell verbally abuses Julie Harrell, discusses his anger with Bill Chandler, and then the couple talk about whether Martin Harrell killed Bobby Powell. (Id. at 14-18, 50.)   The Government's only argument for why this communication is not privileged is that Martin Harrell makes verbally abusive statements to Julie Harrell throughout their conversation and states he does not trust her. The Court finds this taped conversation is inadmissible due to the marital communications privilege.

### 21.   The Second Taped Conversation

The Government next describes a second taped conversation between Julie Harrell and Martin Harrell that primarily involves verbal and physical abuse of Julie Harrell by Martin Harrell, also includes the couple discussing divorce, and during which Martin Harrell comments he would have been better off if Bill Chandler had killed him.  (Id. at 18-21, 50-51.)  The Court believes this tape provides insufficient evidence that the Harrells' marriage is moribund, and without such a determination, these communications are protected by the marital communications privilege, regardless of the surrounding threats.

### 22.   Julie Harrell's Observations of Martin Harrell's Phone Conversation on October 19, 2000

The Government contends Julie Harrell will testify that she observed Martin Harrell on the phone on October 19, 2000, threatening someone about a cow and saying he had to go down. (Id. at 51.)  Because Martin Harrell made this statement to a third party, albeit over the telephone, in Julie Harrell's presence, this communication was not made in confidence.

17

Therefore, Martin Harrell cannot assert the marital communications privilege to stop Julie Harrell from testifying to this communication.

### 23.   Martin Harrell's Comments Regarding His Appearance in Magistrate Court and Possible Subsequent Arrest

The Government states Julie Harrell is expected to testify that Martin Harrell told her that he had to make an appearance in Magistrate Court on November 6, 2000, about whether he was stalking Bill Chandler and that he further told her he would find out in two days whether he would be arrested.  (Id.)  The Government contends these communications were not intended to be confidential because this information was known by others, including court staff and Bill Chandler.  (Id.)  However, the key inquiry under the marital communications privilege is not whether other people may have known certain information, but whether the communication in question was intended to be private—and that privacy can be destroyed when statements are made in the presence of third parties.  There has been no allegation here that court staff or Bill Chandler was present when Martin Harrell allegedly spoke with Julie Harrell about these matters, or that Martin Harrell told Julie Harrell this information intending her to tell it to others.  Therefore, the communications will be presumed private, per the privilege, and these statements are inadmissible under the Government's asserted reason.[8]

### 24.   Martin Harrell's Statements Regarding Future Crimes Against Bill

---

[8] The Court recognizes the Government may be able to provide other, valid reasons to find this testimony admissible or introduce other testimony so that the gist of the comments is admitted into evidence without Julie Harrell's testifying to the communication itself.  The Court expresses no opinion on such or similar potential future rulings.

**Chandler**

The Government states Julie Harrell will testify that Martin Harrell told her he was "coming after" Bill Chandler and made references to future crimes he intended to commit against him.  (Id. at 51-52.)  These communications, the Government contends, are admissible because of the competing public policy to prevent the prevention of future crimes, particularly violent ones, which it asserts other courts have recognized.  However, those courts that have dispensed with the marital communications privilege as it relates to future crimes have done so under the aforementioned "partnership in crime" exception to the privilege, which applies to "present or future crimes in which *both spouses are participants*."  Marashi, 913 F.2d at 730 (emphasis added); see also United States v. Fultz, 1995 WL 392020 (9th Cir. 1995) (collecting cases).  "This exception is rationalized on the ground that the public benefit advanced by protecting marital communication is minimal, if not existent, when spouses exploit their privacy to plan or perform criminal acts."  United States v. Neal, 532 F. Supp 942, 946 (D.C. Colo. 1982).

Although the Government argues that other courts have recognized a future crimes exception to the marital privilege similar to the one recognized under the attorney-client privilege, and cites to Edwards v. Lamarque, 439 F.3d 504 (9th Cir. 2005) as an example, the future crimes exception contemplated in Edwards was in fact the "partnership in crime" exception.  In Edwards, the husband and wife had engaged in a joint insurance fraud scheme, and the trial court ruled the husband could not invoke the marital communications privilege to bar his wife from testifying regarding that scheme.  Id. at 506.  The Court has been unable to

find a case that analogizes the future crime exception to the attorney client privilege with a similar exception for the marital communications privilege where only one spouse is engaged in criminal activity rather than when they both are.  See, e.g., State v. Heistand, 708 S.W.2d 125, 126 (Mo. 1986).  Like the Government's line of reasoning regarding the public policy basis for not protecting an abusive marriage, this policy argument appeals to common sense, but has little to no support in case law.  The Court finds these communications inadmissible due to the marital communications privilege.[9]

### 25.   Martin Harrell's Statements Regarding the Alleged Promiscuity of Christy Chandler

The Government alleges Julie Harrell will testify regarding comments Martin Harrell made that impugn Christy Chandler's honor.  (Doc. # 254 at 51-52.)  The Government contends this admitted communication is not privileged because it is not entitled to protection under the public policy surrounding marital privilege and it is "part of the res gestae of the statements of [Martin's] future intent to commit crimes against Bill Chandler."  (Id. at 52.)  Having just ruled that the statements Martin Harrell may have made regarding potential future violence towards Bill Chandler are protected by the marital communications privilege, the Court finds no compelling reason to alter its analysis for the statements related to Christy Chandler.  Accordingly, these statements are inadmissible.

### 26.   Julie Harrell's Observations of Martin Harrell's Computer Work

---

[9] While one could make an argument for an emergency exception to prevent a future crime about to happen, that is obviously not the case here.

The Government contends Julie Harrell will testify that she observed Martin Harrell working on the Bill Chandler case night and day on the computer on two occasions: on March 22, 2001 and April 9, 2001. (Id. at 53.) Observations are not subject to protection under the marital communications privilege, and therefore such testimony is not inadmissible due to the privilege.

### 27.   Martin Harrell's May 2001 Statements Regarding the Chandlers

The Government also proffers that Julie Harrell will testify about additional comments Martin Harrell made regarding Christy Chandler's personal life and threats Martin Harrell made regarding Bill Chandler during the first week of May 2001. (Id.) The Government argues these communications are admissible because they contain references to Martin Harrell's future intent to commit crimes against Bill Chandler. The Court rejects that argument for reasons already stated, and finds these comments are inadmissible.

### 28.   Martin Harrell's July 7, 2001 Statements Regarding Bill Chandler

The Government contends Julie Harrell will testify she observed Martin Harrell reading legal papers from Bill Chandler's attorneys and making additional threats towards Bill Chandler on July 7, 2001. (Id.) The Government argues these communications are admissible because they were not communications between Martin Harrell and Julie Harrell, because she merely observed him muttering these words, and he did not address them to her. (Id.) Also, the Government contends Martin Harrell later made threats and engaged in physical violence. Because observations are not subject to protection under the marital communications privilege, testimony regarding Julie Harrell's seeing Martin Harrell receive and read legal papers is not

21

inadmissible due to the privilege.  However, comments Martin Harrell allegedly muttered in front of Julie Harrell are communications between spouses.  That they are made as mutters is beside the point.  Inter-spousal mutters  are inadmissible.

**III.    CONCLUSION**

      **SO ORDERED**, this the 26th day of April, 2006.

              **s/   Hugh Lawson**
              HUGH LAWSON, JUDGE

pdl